UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

BRIGHTSTAR CORP.,

    Plaintiff,

v.

DAVID MAYLAND,

    Defendant.
_____/

Case No.

**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES
AND DEMAND FOR JURY TRIAL**

Plaintiff Brightstar Corp. ("Brightstar" or the "Company") files this Complaint for Injunctive Relief and Damages against Defendant David Mayland ("Mayland") through undersigned counsel, and respectfully alleges as follows:

**I. INTRODUCTION AND NATURE OF THE ACTION**

1.  Brightstar brings federal claims for violations of the Defend Trade Secrets Act, 18 U.S.C. § 1831, *et seq.* ("DTSA"). Brightstar also brings state claims for breach of contract, and for actual and threatened misappropriation of Trade Secrets in violation of the Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001, *et seq.* ("FUTSA") against Mayland. Brightstar has suffered and will continue to suffer substantial and irreparable harm unless Mayland is enjoined.

**II. PARTIES**

2.  Brightstar distributes wireless communications devices and provides associated services domestically and globally.

3.  Brightstar is a Delaware corporation with its principal place of business in Miami, Florida.

4. Mayland was an employee of Brightstar from August 6, 2013 to July 1, 2020.

5. In or around May 2016, Mayland was appointed to the position of Senior Director of Corporate Development.

6. In or around November 2019, Mayland was appointed Vice President of Corporate Development of Brightstar.

7. During his employment with Brightstar, Mayland was based in Miami, Florida.

8. Upon information and belief, Mayland is a resident of Florida.

### III. JURISDICTION AND VENUE

9. This Court has personal jurisdiction over the parties under Florida's long-arm statute, Fla. Stat. § 48.193(1)(a), because Mayland has conducted business and substantial activities in Miami, Florida, and Brightstar's primary place of business is in Miami, Florida.

10. This Court also has personal jurisdiction over all parties to this controversy because the parties executed a "Employee Confidentiality, Non-Disclosure, Non-Solicitation, and Non-Compete Agreement" dated August, 6, 2013 (the "RCA") that states: "The Employee hereby consents to personal jurisdiction…in the United States District Court for the Southern District of Florida, Miami Division, if such Court can exercise jurisdiction over the matter for any action brought by the Company or the Employee arising out of or in connection with this Agreement or the Employee's employment with the Company." A true and correct copy of the RCA is attached as Exhibit 1.

11. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) because Brightstar asserts claims under the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836.

12. This Court has supplemental jurisdiction over Brightstar's state-law claims under 28 U.S.C. § 1367.

13. Venue is proper in this District because Mayland resides in this District, and because "a substantial part of the events or omissions giving rise to the claim occurred" in this District. 28 U.S.C. §§ 1391(b)(1) and (2).

14. Additionally, venue is proper in this District because the RCA states, "The Employee hereby consents to…exclusive venue in the United States District Court for the Southern District of Florida, Miami Division, if such Court can exercise jurisdiction over the matter for any action brought by the Company or the Employee arising out of or in connection with this Agreement or the Employee's employment with the Company." Ex. 1 at 9-10.

## IV. FACTS

### A. Brightstar's Business

15. Brightstar is a global provider of communications devices and netbook computers, providing various services in the wireless industry including logistics, strategic sourcing, management, and supply chain optimization.

16. Brightstar's employees facilitate the delivery of these products and services through sales, distribution, assembly, manufacturing, and marketing operations.

17. The methods, techniques, processes, and proprietary financial information used to evaluate Company performance and to derive and prepare internal and external valuations of the Company, are Trade Secrets of the Company under the relevant contracts, DTSA, and FUTSA. 18 U.S.C. §1839(3); Fla. Stat. § 688.002 (hereinafter referred to as "Trade Secrets").

18. In order to attract and retain qualified employees, the Company offered a Long-Term Incentive Plan (the "LTIP") to a portion of its employees in 2016. A true and correct copy of the LTIP is attached as Exhibit 2.

## B. The RCA

19. On August 6, 2013, Brightstar hired Mayland as a Director of Corporate Development responsible for global acquisitions, joint ventures, and other business development projects.

20. On that date, Mayland entered into a RCA with Brightstar. Exhibit 1.

21. Mayland remained an employee of Brightstar for nearly seven years. During his tenure, Mayland held various positions of increasing seniority within the Company, most recently that of Vice President of Corporate Development.

22. In his capacity as Vice President of Corporate Development, Mayland prepared financial information relating to the Company and its operations, as described in Paragraph 15 of this Complaint.

23. As a result, Mayland was privy to highly sensitive financial information and Trade Secrets for at least the last several years of his employment at Brightstar. As such, the RCA contained reasonable covenants to protect the Company's interest in its valuable Confidential Information[1] and Trade Secrets (Confidential Information and Trade Secrets are collectively referred to hereinafter as "Protected Information").

24. In the RCA, Mayland agreed that he would not, even after the termination of his employment, disclose or use for his own benefit or that of any other person or entity, any Protected Information (as defined in Footnote 1, below) of the Company. The RCA provides:

> **(iv) Non-Disclosure of Confidential Information of the Company.**
>
> As a material inducement to the Company to allow the Employee to remain an employee of the Company, and as a material inducement to the Company to disclose or allow to be known to the Employee some or all of the Confidential… the Employee **shall not, directly or indirectly, without the**

---

[1] "Confidential Information" as used here and throughout this Complaint refers to that term as it is more fully described in Paragraph 2(b) of the attached RCA.

> **prior written consent of the Board of Directors of the Company, or a person duly authorized thereby, other than to a person to whom disclosure is reasonably necessary or appropriate in connection with the performance by the Employee of the duties of the Employee as an employee of the Company, disclose or use for the benefit of himself/herself or any other person, corporation, partnership, joint venture, association, or other business organization, any of the trade secrets or Confidential Information of the Company.**

Ex. 1 at 5 (emphasis added).

25. The RCA defines "Confidential Information" as including but not limited to Trade Secrets, future Company business plans, project files, sales information and sales volumes. Ex. 1 at 3.

26. The RCA further defines Confidential Information as including that information considered to be Trade Secrets under FUTSA and DTSA, providing:

> (ii) any information that is of value or significance to the Company that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, including information not generally known to the competitors of the Company nor intended by the Company for general dissemination.

Ex. 1 at 2-3.

27. As Brightstar's operations are dispersed domestically and globally, the Trade Secrets are used in interstate commerce, as required by the DTSA.

28. The RCA is reasonably tailored, limiting itself such that Confidential Information shall not include any:

> (a) information known generally to the public (other than as a result of unauthorized disclosure by Employee),
> (b) information that became available from a third party source and such source is not bound by a confidentiality agreement, or
> (c) any information not otherwise considered by the Board of Directors of Brightstar Corp. to be Confidential Information.

Ex. 1 at 3.

29. The RCA provides that if duration, area, or scope of any restriction specified is "adjudged unreasonable in any proceeding, then [the restriction] shall be reduced so that the restrictions may be enforced as is adjudged to be reasonable." Ex. 1 at 7.

30. Additionally, the RCA provides that "the invalidity or unenforceability of any provision of the [RCA] shall not affect the validity or enforceability of any other provision of the [RCA], which shall remain in full force and effect." Ex. 1 at 10.

31. As Mayland acknowledge in the RCA, "in the event of a breach by the Employee of any restrictive covenant set forth in this Agreement, the Employee agrees that such a breach would cause irreparable injury to the Company." Ex. 1 at 6-7.

32. Finally, the RCA provides, "in the event of a breach by the Employee of any restrictive covenant…the Company shall be entitled to seek all available civil remedies…including, without limitation, an injunction without posting a bond, monetary damages, attorneys' fees, and costs." Ex. 1 at 7.

### C. The LTIP

33. On April 2, 2016, the Company's LTIP became effective. The LTIP provided employees with the opportunity to earn cash-based long-term incentive compensation contingent upon the Company's performance over a specified time period, and the employee's continued service with the Company.

34. As this was an incentive program, which the Company freely offered to a select group of employees, continued eligibility was also contingent upon each employee's performance and compliance with the LTIP's covenants.

35. Mayland was a participant in the LTIP.

36. On February 6, 2019, the LTIP was amended, lowering the threshold at which employees would be eligible for compensation under the Plan.

37. Under the LTIP, if the Company met that lowered performance threshold based on a valuation of the Company as of December 31, 2019, LTIP participants would receive certain cash payments.

38. The Company did not reach that threshold and accordingly, participants did not receive cash payments under the LTIP.

39. Importantly, both the original LTIP, as well as its 2019 amended version, contained "Confidentiality Covenants." Exhibit 2 at 4-5.

40. These Confidentiality Covenants provided, in relevant part:

> during a Participant's employment with Brightstar and at all times after the termination of the Participant's employment with Brightstar for any reason, the Participant **shall not, Directly or Indirectly, without the prior written consent of the Board, or a person duly authorized thereby, disclose or use for the benefit of the Participant or any other person…any Confidential Information,** other than to a person employed by Brightstar or any Affiliates to whom disclosure is reasonably necessary or appropriate in connection with the performance of the Participant's duties as an employee of Brightstar.

Ex. 2 at 4-5 (emphasis added).

41. While the LTIP does not explicitly define Confidential Information, as the RCA does, reasonable construction would implicate the same definitions for both, concordant with and comprising the definition of Trade Secrets in the DTSA and FUTSA.

### D. Mayland Uses or Discloses or Threatens to Use or Disclose Brightstar's Protected Information for His Own Benefit

42. At all times during and following Mayland's employment with Brightstar, Mayland was contractually bound to protect the Company's Protected Information.

43. In fact, in the RCA, Mayland acknowledged that the Non-Disclosure covenant was a material inducement that allowed Brightstar to share its Protected Information.

44. On or about March 30, 2020, Mayland was one of approximately 1,000 employees furloughed by Brightstar.

45. Prior to his furlough, Mayland was engaged in the preparation of confidential financial information relating to the Company.

46. Had Brightstar had any inkling of Mayland's questionable ethics and frail loyalties, Brightstar would never have employed Mayland, let alone entrusted him with such sensitive financial information.

47. Upon information and belief, Mayland retained Protected Information related to that work, illegally taking it with him when he ceased to be an employee of the Company.

48. In order to conduct its business with its parent company ("SoftBank"), lenders, investors, and other essential business functions, Brightstar prepares annual financial information and conducts an annual valuation of the Company.

49. During the first quarter of 2020, Brightstar contracted an independent firm to conduct such a valuation of the Company (the "2020 Independent Valuation").

50. The 2020 Independent Valuation contained Protected Information. As a result, it was made available only to LTIP participants, and only upon request.

51. Upon information and belief, in or around March 2020, Mayland, in his capacity as an LTIP participant, requested and received a copy of the 2020 Independent Valuation.

52. Upon information and belief, Mayland made this request not as an inquisitive LTIP participant, but with the intent of procuring the Protected Information to bolster his own position.

53. On July 1, 2020, Mayland was notified that he was part of a reduction in force.

54. Upon information and belief, Mayland retained legal counsel shortly prior to his termination, as he embarked on a plan to seek LTIP payment to which he was not entitled.

55. Beginning in June 2020 and through the present, Mayland, directly and through his counsel, has made several threatening communications to Brightstar demanding LTIP payment.

56. Brightstar explained to Mayland that the relevant Company valuation did not meet the threshold set forth in the LTIP and as a result, he was not entitled to any payment under the LTIP.

57. Refusing to accept this, Mayland began to threaten Brightstar, indicating that he has reason to believe, based on Protected Information he accessed as an employee, that contrary to the 2020 Independent Valuation, the Company had met the threshold for a cash payout to LTIP participants, in particular himself.

58. Mayland threatened to go public with spurious and baseless allegations.

59. In making these threats, Mayland illegally used or disclosed or threatened to use or disclose the Protected Information he apparently had retained as leverage, thinking the Company would pay any price for the safety of its highly classified information.

60. In essence, Mayland attempted to sell the Company its own Protected Information.

61. In making these threats, Mayland held hostage the Company's Protected Information, including the 2020 Independent Valuation and internal financial information he illegally retained, using them for his own benefit in his attempts to sell them to the highest bidder.

62. Attempting to force Brightstar into making this payment, Mayland even threatened to bring suit against Brightstar premised on baseless claims, a "Trojan horse" through which he would disclose Protected Information.

63. These threats not only breach the RCA and LTIP (collectively, "the Agreements"), by Mayland using his possession of Protected Information for his own benefit, but also demonstrate the deepest disrespect for the judicial system.

### E. Mayland Uses or Discloses or Threatens to Use or Disclose Brightstar's Protected Information for the Benefit of a Third Party

64. Mayland's communications to Brightstar further weaponized the Company's Protected Information by reference to a pending shareholder action in Delaware (the "Delaware Action").

65. In the Delaware Action, minority shareholders are exercising their rights under § 262 of the General Corporation Law of the State of Delaware ("DGCL") to demand an appraisal of the value of common shares of the Company in connection with a merger under § 267 of the DGCL. The Delaware Action is integrally related to the 2020 Independent Valuation.

66. Mayland represented to Brightstar that he has been in contact with the Delaware Action representatives, and that they invited him to serve as an expert witness in the Action.

67. Upon information and belief, Mayland used or disclosed or threatened to use or disclose the Protected Information which he illegally retained in his communications with participants in the Delaware Action.

68. Importantly, no members of the Delaware Action have legal access to any of the relevant Protected Information that Mayland possesses.

69. In an effort to bridge that gap, Mayland has used or disclosed or threatened to use or disclose not only Protected Information, but also to use such Information to testify regarding the proprietary process, formulas, and analysis behind confidential presentations he has retained, as well as the 2020 Independent Valuation, which he only accessed through his LTIP participation, and was subject to the confidentiality provision in the LTIP Plan.

70. Mayland has used or disclosed or threatened to imminently use or disclose the mechanics of Brightstar's financial information, including future business plans, the projections

of which are reflected in confidential presentation materials, and sales information reflected in both the presentation materials and the 2020 Independent Valuation.

71. The aforementioned Protected Information used or disclosed or threatened to be used or disclosed are protected under the DTSA and FUTSA as financial information, compilations, and methods of valuation, from which Brightstar derives independent economic value, and takes reasonable efforts to guard. 18 U.S.C. § 1839; Fla. Stat. § 688.002.

72. In addition to the traditional methods a company may take in the course of business to protect sensitive financial information, Brightstar took the affirmative step of requiring Mayland to execute the RCA, which emphasizes that the Company continually expends significant time and expense to protect its Protected Information, as their exclusive control is essential to maintain their value. Ex. 1 at 1.

73. Mayland has used or disclosed or has threatened to use or disclose the methods and techniques by which Company financial statements are prepared, all of which are closely guarded Protected Information, and subject to the Agreements, thereby holding himself out to be a so-called "expert" for use in the Delaware Action.

74. Brightstar is validly concerned about protecting its Protected Information, as two of the minority shareholders in the Delaware Action are employed by direct competitors of Brightstar, and disclosure of this Protected Information to competitors or other third parties would do irreparable harm.

75. Brightstar has not and does not consent to any use or disclosure, direct or indirect, by Mayland of Company Protected Information.

76. Mayland knew, or should have known that using or disclosing or threatening to use or disclose Brightstar's Protected Information would cause irreparable damage to Brightstar.

77. The very purpose of establishing confidentiality provisions in the Agreements was to prevent such irreparable harm. Mayland knew this, and was counting on that potential loss in making these threats.

## V. CAUSES OF ACTION

### A. Count One—Violations of the Federal Defend Trade Secrets Act ("DTSA")

78. Brightstar incorporates Paragraphs 1 through 77 of this Complaint as fully set forth herein.

79. Mayland has, without authorization, used or disclosed or threatened to use or disclose Brightstar's Trade Secrets, as that term is defined in the DTSA, for his own benefit.

80. Mayland has done so, and continues to do so in full knowledge of the irreparable harm this is causing or will cause to Brightstar.

81. DTSA provides in pertinent part: "An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

82. Brightstar is a global corporation and the Trade Secrets misappropriated by Mayland are valuable and used in Brightstar's products and services globally and domestically.

83. DTSA provides for injunctive relief "to prevent any actual or threatened misappropriation," which is necessary and appropriate in order to prevent further irreparable harm to the Company. 18 U.S.C. § 1836(3)(A).

84. DTSA further provides for monetary damages and exemplary damages, both of which are appropriate here, because Brightstar has suffered actual loss and where Mayland's misappropriation was done in a willful and malicious manner. 18 U.S.C. § 1836(3)(B).

**B. Count Two—Violations of the Florida Uniform Trade Secrets Act ("FUTSA")**

85. Brightstar incorporates Paragraphs 1 through 77 of this Complaint as fully set forth herein.

86. Mayland has, without authorization, used or disclosed or threatened to use or disclose Brightstar's Trade Secrets, as defined in FUTSA, to his own benefit, misappropriating Trade Secrets within the meaning of Fla. Stat. § 688.002.

87. Mayland has done so, and continues to do so in full knowledge of the irreparable harm this is causing or will cause to Brightstar.

88. FUTSA provides in pertinent part: "Actual or threatened misappropriation may be enjoined." Fla. Stat. § 688.003(1).

89. FUTSA further provides for monetary damages and exemplary damages, both of which are appropriate here. Brightstar has suffered actual loss and Mayland's breach of his RCA and the LTIP and his misappropriation of Trade Secrets were done in a willful and malicious manner. Fla. Stat. §§ 688.004(1) and (2).

**Count Three—Breach of the Restrictive Covenant Agreement**

90. Brightstar incorporates Paragraphs 1 through 77 of this Complaint as fully set forth herein.

91. Brightstar and Mayland entered into the RCA, a valid contract. Exhibit 1.

92. In the RCA, Mayland agreed that he would not, directly or indirectly, disclose or use for his own benefit or for the benefit of others, any Protected Information. Ex. 1 at 5.

93. Mayland breached the RCA by using or disclosing, or by implication, threatening to use or disclose, for his own benefit, Brightstar's Protected Information to threaten Brightstar, for his own financial gain. Fla. Stat. § 542.33.

94. Mayland breached the RCA by using or disclosing or by implication, threatening to use or disclose Protected Information, including but not limited to serving as paid expert witness in the Delaware Action, and through frivolous suits of his own design.

95. Mayland's breaches of the RCA caused and continue to cause Brightstar to suffer irreparable harm in the insecurity of its Protected Information and its continued ability to compete in the marketplace.

96. Mayland explicitly threatens breaches that would irreparably harm the Company in all aspects of its business operations.

97. Brightstar has no adequate remedy at law, and will suffer substantial and irreparable harm unless Mayland is preliminarily and permanently enjoined from the actions described herein. Ex. 1 at 6-7.

98. Mayland's aforementioned threat to use or disclose Protected Information, including but not limited to serving as paid expert witness will cause irreparable harm to Brightstar, as two of the minority shareholders participating in the Delaware Action are direct competitors of Brightstar.

99. Breach of the restrictive covenants in the RCA subjects Mayland to liability for damages and preliminary and permanent injunctive relief, as well as attorneys' fees and costs. Ex. 1 at 6-7.

**Count Four—Breach of the Long-Term Incentive Plan Confidentiality Covenants**

100. Brightstar incorporates Paragraphs 1 through 77 of this Complaint as fully set forth herein.

101. Mayland freely entered into the LTIP, a valid contract. Exhibit 2.

102. As an LTIP participant, Mayland agreed that he would not, directly or indirectly, disclose or use for his own benefit or for the benefit of others, any Protected Information. Ex. 1 at 5.

103. Mayland breached the LTIP by using or disclosing or by implication, threatening to use or disclose, for his own benefit, Protected Information to threaten Brightstar, for his own financial gain.

104. Mayland breached the LTIP by using or disclosing or by implication, threatening to use or disclose, for his own benefit, Protected Information in communications with representatives in the Delaware Action.

105. Mayland breached the LTIP by using or disclosing or by implication, threatening to use or disclose Protected Information for the benefit of a third party, including but not limited to serving as paid expert witness and through frivolous suits of his own design.

106. Mayland's breaches of the LTIP caused and continue to cause Brightstar to suffer irreparable harm in the insecurity of its Protected Information.

107. Mayland threatens breaches that would irreparably harm the Company in all aspects of its business operations.

108. Brightstar has no adequate remedy at law, and will suffer substantial and irreparable harm unless Mayland is preliminarily and permanently enjoined from the actions described herein. Ex. 1 at 6-7.

109. Mayland's aforementioned threat to use or disclose Protected Information, including but not limited to serving as paid expert witness will cause irreparable harm to Brightstar, as two of the minority shareholders participating in the Delaware Action are direct competitors of Brightstar.

## VI. STATEMENT OF IRREPARABLE INJURY TO BRIGHTSTAR

110. Brightstar has been, and continues to be subjected to irreparable injury for which no remedy at law exists.

111. The unlawful actions by Mayland, his agents, and those acting in concert with him are causing and will continue to cause great and irreparable harm to Brightstar's businesses, which cannot be remedied adequately by an award of monetary damages.

112. Without this Court's intervention, there is a real, present, and continuing threat that Mayland will breach his agreement with Brightstar, wrongfully use or disclose, or continue to use or disclose, Brightstar's Protected Information.

113. Mayland's use or disclosure of Brightstar's Protected Information, which would inevitably result from his serving as an expert witness in the Delaware Action, would cause Brightstar irreparable harm for which Brightstar has no remedy at law.

114. Unless preliminary and/or permanent injunctions are entered on the terms set forth below, greater injury will be inflicted upon Brightstar than could possibly result to Mayland by the granting of said relief. Mayland will be harmed by the granting of the prayed-for injunctive relief only to the extent that the order will compel Mayland to abide by his obligations imposed by law.

115. Brightstar has legitimate and protectable business interests in its Protected Information, including financial information and business operations.

## VII. PRAYER FOR INJUNCTIVE RELIEF

116. WHEREFORE, Brightstar prays that:

   a. judgment be entered in favor of Brightstar and against Mayland; and

   b. the Court enjoin Mayland from the actions described herein, including by ordering the following:

  (i)  a preliminary and permanent injunction providing that Mayland shall not, directly or indirectly, use or disclose or threaten to use or disclose Brightstar's Protected Information in any way whatsoever, including but not limited to attempting to bolster his own financial position and/or benefit or providing such information to third-parties, including but not limited to serving as a paid expert witness in the Delaware Action; and

  (ii)  a preliminary and permanent injunction providing that Mayland shall not, directly or indirectly, use or disclose or threaten to use or disclose Brightstar's Protected Information Brightstar's Protected Information in any way whatsoever, including but not limited to using or disclosing such information to parties or counsel or any person associated with or affiliated in any way with the Delaware Action or any other legal action, unless compelled to do so by law.

## VIII. PRAYER FOR DAMAGES AND SUCH OTHER RELIEF

117. Brightstar further prays for:

    a. all damages sustained by Brightstar as a result of the wrongful conduct described above, beginning with the earliest date of violation up until the date of the entry of the final judgment in this action, including actual and consequential damages;

    b. pre- and post-judgment interest;

    c. attorneys' fees and costs; and

    d. such other and further relief as this Court may deem just and proper.

118. In addition, Mayland's conduct was wanton, willful, and malicious, so as to justify the imposition of punitive damages. Brightstar intends to seek to amend this Complaint before trial to add a claim for punitive damages pursuant to the procedure set forth in Florida Statutes § 768.72.

## JURY DEMAND

Brightstar demands a jury trial for all issues/claims to which it is entitled to a jury trial.

Dated this 10th day of August 2020.

        Respectfully submitted,

        */s/ Carol A. Field*
        Anne Marie Estevez
        Florida Bar No. 991694
        aestevez@morganlewis.com
        Carol A. Field
          Florida Bar No.: 987166
          Email: carol.field@morganlewis.com
        MORGAN, LEWIS & BOCKIUS LLP
        200 South Biscayne Boulevard, Suite 5300
        Miami, FL 33131
        Phone: (305) 415-3409
        Fax: (305) 415-3001

        *Counsel for Plaintiff Brightstar Corp.*